IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRADLEY JASON JORDAN, | § | |
| | § | |
| *Petitioner,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-3048 |
| | § | |
| RICK THALER, | § | |
| | § | |
| *Respondent.* | § | |

## MEMORANDUM OPINION AND ORDER

Bradley Jason Jordan, a state inmate proceeding *pro se* and *in forma pauperis*, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging his state felony conviction for felony murder of a child.  Respondent filed a motion for summary judgment (Docket Entry No. 11), to which petitioner filed a response (Docket Entry No. 15).

Based on consideration of the pleadings, the motion and response, the record, and the applicable law, the Court **GRANTS** summary judgment and **DISMISSES** this action for the reasons that follow.

## I.  PROCEDURAL BACKGROUND AND CLAIMS

A jury found petitioner guilty of felony murder of a child and assessed punishment at thirty years imprisonment.  The conviction was affirmed on appeal in an unpublished opinion. *Jordan v. State*, No. 09-08-00251-CR (Tex. App. – Beaumont 2009, no pet.). Petitioner did not seek discretionary review, and his state habeas application was denied by

the Texas Court of Criminal Appeals without a written order. *Ex parte Jordan*, No. 75,844-01.

Petitioner complains in the instant petition of ineffective assistance of trial and appellate counsel. The Court has organized and regrouped his claims as follows:

1.   Trial counsel was ineffective in

    a.   failing to request, obtain, and consult with expert witnesses;

    b.   adopting an unreasonable trial strategy; and

    c.   misinforming petitioner as to the State's fifteen-day notice requirement.

2.   Appellate counsel was ineffective in

    a.   failing to file a motion for new trial;

    b.   failing to raise ineffective assistance of trial counsel;

    c.   raising a frivolous issue on direct appeal; and

    d.   failing to meet the requirements of *Anders v. California*.[1]

## II.  FACTUAL BACKGROUND

The state appellate court's opinion on direct appeal did not set forth a statement of facts. However, the record shows, and the parties agree in their respective pleadings, that on March 24, 2006, petitioner called 911 and reported that his girlfriend's baby fell out of bed, hit his head, and was not breathing. He changed his story a few seconds later and stated that the child, Mason Alvis, had fallen down the steps. An irregular, high-pitched wheezing

---

[1]386 U.S. 738 (1967).

2

could be heard in the background during the 911 call. EMS services were dispatched to the residence, where paramedic Erik Richenberger found an unconscious male toddler, later identified as Mason Alvis, lying on the floor. The child's labored breathing would speed up then stop, a breathing pattern recognized by Richenberger as Cheyne-Stokes breathing, which often indicated a severe head injury. He observed other signs of severe head trauma, including dilated pupils that did not react to light and a very slow heart beat. Richenberger assessed the child's consciousness level on the Glasgow Coma Scale as four, only one level above cardiac arrest or death. Mason was 27-months old at the time.

Petitioner told Richenberger that the child had fallen down the third step on the outside stairs and struck his face on the ground. Richenberger, however, found no elbow or shoulder scrapes which would normally occur when someone tries to stop a fall; he also noted that the distance from the step to the ground was only 36 inches. Moreover, there was no blood on the ground and the child's clothing showed no grass stains, dirt, or other indications of the reported fall.

After removing the child's clothing, Richenberger saw that the child had serious brown and blue bruising in various stages of healing, which suggested injuries indicative of abuse rather than a fall. Richenberger asked petitioner for Mason's medical history, allergies and current medications, but petitioner responded that he knew only the child's name. Richenberger found petitioner's silent, calm demeanor at odds with what he normally experienced when responding to child accident reports. He concluded that the child's

3

injuries could not have been caused by a fall down the steps. Suspecting child abuse, Richenberger notified the Montgomery County Sheriff's Office. In the meantime, Mason was transported by Life Flight to Memorial Hermann Hospital.

Detective James Glisson of the Montgomery County Sheriff's Office was assigned to investigate the case. Upon his arrival at Memorial Hermann Hospital, he was informed that Mason had suffered a serious head injury and was in critical condition. Glisson contacted Mason's mother, Katie Blake, who stated that she had been at work that morning and that she and petitioner had been living together for three months. She stated that Mason has been fine the day before and during the night, and that she had left home early that morning after asking petitioner to take Mason to daycare. According to Blake, Mason was a clumsy but tough child who could walk up and down the outside steps without trouble, and had only "whine[d] for a second" when he fell on the steps in the past. Blake did not believe that petitioner had injured her child. Mason's daycare provider testified that she had observed him fall down while at daycare due to his clumsiness, and that he was a clumsy child who fell down often.

Mason died in the hospital the next day. An autopsy undertaken by the Harris County Medical Examiner's Office revealed a total of nine bruises on Mason's scalp, a linear scrape with bruising on the back of his head, and other areas of purple bruising or hemorrhaging. Bruising on Mason's penis was also observed, which the assistant medical examiner believed could have been caused by pinching. Test results showed that six of the scalp bruises had

4

occurred around the same time. Internal examination of Mason's brain revealed swelling, numerous ruptured membranes, and severe hemorrhaging. Mason's eyes revealed posterior and anterior retinal hemorrhaging. The assistant medical examiner concluded that Mason had died of blunt force injuries to his head, consistent with a three to five foot fall, but that the sheer number of bruises and scalp lacerations on Mason's body, in various stages of healing, were inconsistent with a single fall.

The State's forensic pediatric specialist ruled out the possibility that Mason could have received the head injuries from his mother, acted normally for a period of time, then later, in petitioner's presence, exhibit Cheyne-Stokes respiration. The specialist also found it medically improbable that Mason's head injuries were the result of falling out of bed or down the outside steps. According to the specialist, the extent of Mason's brain damage and retinal hemorrhaging strongly suggested that Mason died from being violently shaken and subjected to an impact to the head.

Petitioner was indicted for, and found guilty of, murder in that he committed "a felony, namely: Injury to a Child, and in the course of or in furtherance of the felony . . . commit[ted] an act clearly dangerous to human life, namely: causing blunt force trauma to Mason Alvis' head, thereby causing the death of . . . Mason Alvis[.]" The jury assessed punishment at thirty years incarceration.

### III.  THE APPLICABLE LEGAL STANDARDS

A.    <u>Habeas Review</u>

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254.  Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2).  A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409.  In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id.* at 411.

The AEDPA affords deference to a state court's resolution of factual issues.  Under 28 U.S.C. §2254(d)(2), a decision adjudicated on the merits in a state court and based on a

factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 330–31.

B.    Summary Judgment

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by

clear and convincing evidence, the state court's findings must be accepted as correct by the

federal habeas court. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on*

*other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

## IV.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The Sixth Amendment to the United States Constitution guarantees a criminal

defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI.  A federal

habeas corpus petitioner's claim that he was denied effective assistance of counsel is

measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  To

assert a successful ineffectiveness claim, a petitioner must establish both constitutionally

deficient performance by counsel and actual prejudice as a result of counsel's deficient

performance. *Id.* at 687.  The failure to demonstrate either deficient performance or actual

prejudice is fatal to an ineffective assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035

(5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of

reasonableness. *Strickland*, 466 U.S. at 688.  In determining whether counsel's performance

was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor

of finding that trial counsel rendered adequate assistance and that the challenged conduct was

the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996).

To overcome this presumption, a petitioner must identify the acts or omissions of counsel

that are alleged not to have been the result of reasonable professional judgment. *Wilkerson*

*v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland*, 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 694. To determine prejudice, the question focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). In that regard, unreliability or unfairness does not result if the ineffectiveness does not deprive the petitioner of any substantive or procedural right to which he is entitled. *Id.*

Petitioner alleges here that trial counsel was ineffective in the following instances.

A.     Failure to request, obtain, and consult with expert witnesses

Petitioner complains that trial counsel failed to request, obtain and consult with an expert medical witness or forensic pathologist for defense and rebuttal purposes.

In his affidavit submitted to the trial court on collateral review, trial counsel testified, in relevant part, as follows:

> Trial Counsel did not file a Motion for the Trial Court to appoint a defense Medical Expert. The issue at trial was not the injuries sustained by twenty-seven (27) month-old Mason Alvis (hereinafter Mason); but, when did those injuries occur; and who caused those injuries to Mason. From the beginning, Applicant stated that he (Applicant) was in sole care, custody and control of Mason during the early morning hours of March 24, 2006. The initial medical assessment by EMS personnel at the scene placed Mason in critical condition, and Life Flight was called to transport Mason to a hospital.

9

The recording of the 911 call made by Applicant reflects Applicant stating:

> 'My girlfriend's baby fell out of the bed and he hit himself and he went into convulsions . . . he's not breathing.'

> 'My girlfriend's baby fell and he started going into convulsions . . . he won't move . . . won't breathe, nothing.'

> 'I was fixing to take [Mason] to day care and he fell down the steps. [Mason] got real tight . . . and jerked his chest and his arms are going real crazy . . . having seizures . . . his breathing is real weird.'

Applicant's statements during the 911 call clearly show that Applicant was with Mason when Mason sustained his injuries. Again, the issue at trial was not the injuries sustained by Mason; but when did those injuries occur; and who caused those injuries to Mason.

*   *   *   *

Trial counsel did not request an accident reconstruction expert because the information contained in the State's file put Applicant's explanation about Mason falling off the 3rd step of the front porch as questionable. The photograph admitted as State's Exhibit 4 showed the front exterior of Applicant's residence at 19242 Timberland. The photograph admitted as State's Exhibit 7 showed a closeup of the front steps of Applicant's residence.

*   *   *   *

Erik Richenberger, a Paramedic with Montgomery County Hospital District, who responded to the scene, in his statement stated:

> When asked what happened, the boyfriend stated, '[Mason] was on the third step of the stairs on the porch and fell down hitting his face.' When asked if [Mason] had fallen on the grass or a stone step that was near the base of the stairs, [the boyfriend] replied, '[Mason] fell on the ground.' The boyfriend was asked if he witnessed the fall and he replied, 'Yes.' Upon initial inspection, [Mason] had zero grass stains or grass blades on his body indicating that he fell on the ground.

Katie Blake's statement dated March 24, 2006, at 6:00 p.m. stated:

10

>[I] put Mason to bed last night after falling asleep on the couch around 8:30 p.m. [I] never saw [Mason] this morning. [Applicant] said he put [Mason in the] shower this morning and sprayed him off with the shower head because [Mason] was poopy. Then [Applicant] got [Mason] dressed to go to day care.
>
>[Applicant] said that he was taking Mason to the day care and as they were walking out the front door, [Applicant] realized he had forgotten his cell phone inside the residence. [Applicant] told her that he left Mason on the front porch while he went inside to retrieve his cell phone. [Applicant] told [Katie] that when he returned to the front porch he found Mason lying face down at the bottom of the steps with his arms by his sides.

*Ex parte Jordan*, p. 254, 266–67 (emphasis deleted).

After filing his original application for state habeas relief and after trial counsel provided his affidavit responding to petitioner's claims, petitioner filed a supplemental habeas application. (Docket Entry No. 4-14.) In the supplemental application, petitioner submitted a letter he received from John Plunkett, M.D., dated June 16, 2011. In the letter, Plunkett opined that, based on Mason's autopsy report, shaking "had nothing to do with" Mason's death. Plunkett requested copies of all hospital and police reports, autopsy photographs, and autopsy slides "to complete an evaluation."

Petitioner also submitted an affidavit from Plunkett, wherein Plunkett stated that, "A fall down a flight of steps, even a short flight, may cause fatal brain injuries in a young child." However, this general proposition was not a disputed issue at trial; rather, the medical experts at petitioner's trial testified that *Mason's* injuries were not the result of falling down three or four steps. Plunkett did not state in his affidavit that Mason's fall down

11

the steps caused his fatal brain injuries, nor did his affidavit present exculpatory evidence as to whether petitioner caused Mason's death by blunt force trauma.[2]  Plunkett stated that he would have been available to review the records and testify at trial had defense counsel contacted him, and he emphasized his need for the complete medical and police records, autopsy photographs, and the autopsy microscopic slides "in order to prepare a complete report regarding Mason's injuries."  The Court notes that no final or complete report by Plunkett was filed of record in this case, and any opinions reached by Plunkett as to whether Mason's fall down the steps caused his death remain undisclosed.

Claims that trial counsel was deficient for failing to call certain witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy, and speculation about what witnesses would have said on the stand is too uncertain.  *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010).  Fifth Circuit precedent establishes that a petitioner must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  Petitioner here presents, at most, only Plunkett's preliminary or general thoughts about the case, without any specific opinions or conclusions favorable to a particular defense.  The fact that Plunkett expressed interest in examining the medical records and autopsy evidence does not suffice to satisfy petitioner's

---

[2]Although Plunkett was of the opinion that shaking did not cause Mason's injuries or death, petitioner was not charged with causing Mason's death by shaking.

12

burden of proof under *Day* and *Strickland*, and petitioner fails to show deficient performance or prejudice.

The state court denied relief on petitioner's claims for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of *Strickland*, or was an unreasonable determination of the facts based on the evidence in the record. No basis for habeas relief is shown, and respondent is entitled to summary judgment on this issue.

B.    Unreasonable trial strategy

Petitioner contends that trial counsel's trial strategy was unreasonable in light of the evidence presented at trial. Specifically, he argues that counsel's attempts to blame Katie Blake for Mason's death contradicted expert testimony that Mason would not have been able to walk or talk following his head injuries; petitioner had told EMS personnel that Mason had been acting normally prior to his fall down the stairs. It is petitioner's position that trial counsel should have argued that Mason's fatal injuries were sustained during the fall, despite expert testimony that the fall down three or four steps was an unlikely or improbable cause of Mason's fatal head injuries.

In his affidavit submitted to the trial court on collateral review, trial counsel testified as to the reasons for his chosen trial strategy, as follows:

> 3.    Mason spent Thursday, March 23, 2006, at Na Na's Daycare. Katie Blake (hereinafter Katie) brought Mason to day care between 6:00 a.m. and 7:00 a.m. that morning. Katie also picked Mason up from day care at 6:00 p.m. Katie fed Mason some rice for dinner. Katie said that Mason was

walking normally that evening, as well as talking normally. Katie said that Mason fell asleep on her, and she put him in his bed.

Katie got up early the next morning, Friday, March 24, 2006. Katie did not check on Mason prior to leaving for work at approximately 6:10 a.m. Applicant was supposed to take Mason to day care. At approximately 9:20 a.m., Katie was pulled from her training class by one of her Managers, and advised that Mason was being taken to Memorial Hermann Hospital by Life Flight.

In her written statement of March 27, 2006, Barbara Dempsey [Mason's daycare provider] stated, 'I told Det. Glisson that Mason didn't get any insect bites or marks on that day. I told [him] that I talked to Katie on Sunday, 26th of March and she told me that Mason had a cigarette burn on his penis. Katie said she didn't see him to know if he had a cigarette burn on his penis. I changed Mason . . . approximately 4 times on Thursday, the 23rd of March. At no time did I see any marks on Mason's penis before he was picked up at 6:00 p.m. by Katie.'

Since Applicant did not take Mason to day care on Thursday, March 23, 2006; and, since Applicant had no contact with Mason while Mason was at day care that day; and since Applicant did not pick up Mason from day care that day; and, since there was no information given by Katie or Applicant that Applicant had any interaction with Mason that evening prior to Katie putting Mason to bed; and, since no one other than Katie, Mason, and Applicant spent that night in the residence; and, since Applicant stated that he did not cause the injuries to Mason; Katie Blake was the only other individual who could have caused the injuries to Mason.

4.      Trial counsel discussed with Applicant the 'window of opportunity' regarding the time frame when Mason could have sustained his injuries. Applicant consistently denied causing the injuries to Mason, and blamed Katie for causing Mason's injuries.

Applicant, and only Applicant, decided not to testify at trial. At the conclusion of the State's case in [c]hief, the following colloquy took place between Trial Counsel and Applicant.

COUNSEL:   Mr. Jordan, we're here on the felony murder charge Injury to a
                     Child causing blunt force trauma to the head resulting in death

14

of child Mason Alvis.  You were here Monday when we did the
jury selection, started testimony all day yesterday, all day today.
You and I have discussed the issue as to whether you are going
to testify in your own behalf, that that decision is your decision
alone.  No one can force you to testify.  No one can keep you
from testifying.  If you do testify, you're subject to cross-
examination like any other witness.  After sitting through the
trial so far, the State's eight witnesses, have you made up your
mind as to whether you wish to testify in your own behalf?

APPLICANT:        Yes, sir.  I'm not going to testify.

COUNSEL:  Is anybody forcing you not to testify?

APPLICANT:        No.

COUNSEL:  Have I told you not to testify?

APPLICANT:        No, sir.

COUNSEL:  Have I told you that you had to testify?

APPLICANT:        No, sir.

COUNSEL:  You understand that this is your decision now, and [you] can't
                 come back and say that anyone forced you one way or the other?

APPLICANT:        Yes, sir.

*   *   *   *

6.      Trial counsel expected that Dr. Mary Lynn Anzalone, Assistant Medical
Examiner with the Harris County Medical Examiner's Office, could not testify
as to when the bruises on Mason's head occurred; which of the bruises on
Mason's head caused the injuries inside his skull; which of the bruises on
Mason's head caused the injury that actually caused Mason's death; which of
the bruises occurred first, or last; or, who caused Mason's injuries.

15

Trial counsel expected Dr. Anzalone to testify that she could not expect for a person to sustain a fatal head injury, such as the one sustained by Mason, and continue to behave in a normal manner for a long period of time.

Trial counsel anticipated that Dr. Randell Alexander would testify as to the debilitating effect of the injuries sustained by Mason. Trial counsel expected Dr. Alexander to testify that once the brain injury occurs to a child, such as Mason, that he would not expect the child to be able to stand, walk, talk, or anything.

Trial Counsel expected Dr. Alexander could not testify whether the bruises on Mason's head occurred during the same time period; which bruises on Mason's head occurred first, or last; or, which bruises on Mason's head actually caused the brain injury resulting in Mason's death.

7.      Trial counsel was aware of the State's intent to use Dr. Randell Alexander as an expert witness prior to March 10, 2008, the date the State filed its Discovery Response, which was almost seven (7) weeks prior to trial. Trial counsel discussed Dr. Alexander's anticipated testimony with Applicant regarding the 'window of opportunity' as to the time frame when Mason could have sustained his injuries, and Mason's ability to continue to walk or talk.

8.      In light of the State's evidence, the injuries sustained by Mason occurred after he was picked up from Na Na's Daycare by Katie at 6:00 p.m. on Thursday, March 23, 2006. Katie fed Mason some rice for dinner. Katie said that Mason was walking normally that evening, as well was talking normally. Katie said that Mason fell asleep on her, and put him in his bed. Katie got up early the next morning, Friday, March 24, 2006. Katie did not check on Mason prior to leaving for work at approximately 6:10 a.m. Applicant consistently denied causing the injuries to Mason.

If Mason was uninjured when Katie put him in his bed, the 'window of opportunity' for Mason to sustain his injuries began at that time. Since no one other than Mason, Katie, and Applicant was in the residence, no other scenario was available as to who inflicted Mason's injuries.

*     *     *     *

It was evident from the statements contained in the State's case file, that Paramedics Erik Richenberger and William Sloan immediately determined that

Mason was in 'critical urgent condition, unresponsive, dilated pupils, and very low heart rate – indicative of a severe head injury.'

The [a]utopsy report in [Mason's] case reflects [as] Pathological Findings:

I      Blunt force injuries of head
      A.      Scalp contusions (9)
      B.      Acute subdural hemorrhage, bilateral convexities and right base of brain
      C.      Brain swelling with microscopic ischemic neuronal changes
      D.      Bilateral retinal hemorrhages, optic nerve sheath hemorrhage and hemorrhage of periocular muscle and adipose tissue
II     Contusions of penis (2)
III    Contusions of torso (11) and extremities (8)
IV     Thymic petechiae
V      Ancillary studies
      A.      Toxicology – noncontributory
      B.      Postmortem [viral, bacterial] cultures – noncontributory

It is obvious from all the statements that when the Paramedics first observed Mason, Mason was completely incapacitated. Either Mason sustained the blunt force trauma injuries to his head as the result of falling from the third step of the front porch onto the grass; or Mason sustained the blunt force injuries some other way. In Trial Counsel's opinion, another medical expert could not have testified that Mason could have acted normally after sustaining his injuries.

10.    If Mason was uninjured when Katie put him in his bed, the 'window of opportunity' for Mason to sustain his injuries began at that time. Since no one other than Mason, Katie, and Applicant was in the residence, no other scenario was available as to who inflicted Mason's injuries.

Trial counsel's legitimate theory that explained Mason's traumatic injuries and death that did not implicate Applicant was submitted to the Jury from the very beginning. In his opening statement, Trial Counsel advised the Jury:

> Katie Blake is the Mother of two boys: Justin and Mason; and [Katie] has lots of problems. [Katie] has such bad problems that she cannot take care of her children and [she] gives [sic] the children – one to her [f]ather and one to her [m]other. [Katie]

is not a good mother. [Katie] will tell you that she doesn't even check on her child during the night.

[Katie] is going to tell you that night, the 23rd of March, 2006, she didn't even check on [Mason's] diaper before she went to bed. [Katie is] going to tell you that she didn't even check [on Mason] during the night.  And then as a [m]other, Katie didn't even check [Mason] before she went to work.

But [Katie] did check [Mason].  [Katie] had a special thing at work that day; and whenever she checked Mason, she opened up his diaper; and [Mason] peed all over her.  And the evidence is going to show that [Mason's] little penis is crimped, that [Katie] was so mad that [Mason] peed all over her that she tried to crimp [Mason's penis], just like a water hose to turn it off.  And [Katie] shook [Mason] like she's shaken [Mason] before. [Katie] beat [Mason] like she shaked [sic] him before, [Katie] put [Mason] back in his bed.  [Katie] went to work.

I suggest to you a man wouldn't do that.  Sure, [Mason] fell off the step.  [Applicant] didn't know what happened whenever [Katie] left.  [Katie] said, 'Take [Mason] to the day care.'

The lady from Na Na's Daycare is going to tell you that she changed Mason Alvis'[s] diaper at least four times the day before, and she didn't notice anything about the bruising on [Mason's] little penis. That happened that night. That happened by Katie Blake.  A man wouldn't do that to a boy.

And at the end of all the evidence, you'll not be able to find Brad Jordan guilty of Injury to a Child because he didn't do it.

During cross-examination of Dr. Randell Alexander, the following colloquy occurred.

COUNSEL:  Can you date or time any one of the injuries that's shown in the photographs?

DR. ALEXANDER:      Not by just looking at them, no.

\*   \*   \*   \*

COUNSEL:  The injuries that you saw in the photographs that were taken during the autopsy, is there any way that they can be an accumulation – one occurring one day, one occurring the next day, and so forth – but not any one of them causing the brain injury?

DR. ALEXANDER:      Partly yes and partly no.   You can have accumulation, like, of bruises.  I mean, you can have bruises spaced out over a period of time of various bruises; but as far as the brain, as far as the brain injury that causes death, no.

COUNSEL:  The – the injuries that could possibly be sustained, could they be approaching brain injury but [then] aggravated by a fall or something like that?

DR. ALEXANDER:      Only if you had somebody that was highly symptomatic in the first place.  I mean, if you're saying that it's a succession of brain injuries that – one on top of another that make the situation worse and worse during that time too.  So you'd have to re-postulate the history we have.

\*   \*   \*   \*

COUNSEL:  With the hypothetical that you have a woman who has emotional problems and gives her children away to someone else and gets them back after five, six plus months, and she refuses to take her child to a doctor just for a regular immunization or health checkup and then refuses any type of early educational work for the child for anger management, for toileting, for dressing and for eating, and she says she never saw those bruises on that child, would that be consistent with a good [m]other?

DR. ALEXANDER:      Well, as far as the not seeing the bruises, either they were present and she's not telling the truth or they weren't there yet. As far as the stuff goes on, yes, I would hope a child is getting medical care.

19

I think they should.   And just for regular checkups, I would say that's what we would think of as a higher risk case.

COUNSEL: During your testimony you said that once the brain injury occurs, you would expect that the child can't stand, can't walk, can't talk, or anything, correct?

DR. ALEXANDER:     Yes.

\*   \*   \*   \*

COUNSEL: You testified about the – the pinched penis, that the person who would cause that would be attacking, you said, the thing that's bothering them, correct, the cause of the problem.

DR. ALEXANDER:     Sure.

COUNSEL: Let me ask you this: Hypothetically, someone says, 'At 8:00 at night I checked the diaper and my child was not wet. So I don't change the diaper. And I don't check on my child all night long. And I check on him at 6:00 o'clock the next morning and he's still not wet.' And the child has been laying there for ten hours or more.   Would you consider it to be unusual that the child wasn't wet?

DR. ALEXANDER:     Yeah, it's unusual.  Not impossible, but unusual.

COUNSEL: And if the – if the person said that, yes, I changed my child's diaper then, whatever, and they peed right in his face, the pinching wouldn't be an unusual reaction to a person who was enraged because they just got peed all over before they went to work?

DR. ALEXANDER:     Yeah, it would be an unusual reaction.  I think a lot of parents have been peed on with their kids. But – but if you were going to pinch someone, that scenario you paint is certainly one of the possibilities that I think could, you know, be reasonable to think about.

20

*   *   *   *

COUNSEL:  It's possible that if there was a fall, it could aggravate some circumstances?

DR. ALEXANDER:          Yeah, it could – I mean, you could have a type of an injury where a fall would aggravate a preexisting injury, sure.

It is evident from the record that Trial Counsel attempted to divert the Jury's attention away from Applicant.  Trial Counsel brought Katie Blake into the spotlight as being the individual who caused Mason's traumatic injuries.

*   *   *   *

14.    Trial Counsel did cross-examine Dr. Randell Alexander and Dr. Mary Lynn Anzalone regarding reasonable alternatives that would explain the cause of Mason's death.

During the State's direct examination of Dr. Mary Lynn Anzalone, the following colloquy occurred.

THE STATE:     I am showing you what's been previously marked and entered as State's Exhibit 24.  Based upon the sheer number of injuries to this child, are those injuries consistent . . . with a child who fell down these steps?

DR. ANZALONE:  No.

THE STATE:     Based upon the sheer number of injuries to this child, are those injuries consistent with somebody who fell from this bed?

DR. ANZALONE:  No.

During cross-examination of Dr. Mary Lynn Anzalone, the following colloquy occurred.

COUNSEL:  You told us before that you could not date any of the injuries that you consider to be focal points, correct?

21

DR. ANZALONE:  I can't tell you exactly the time and day that those occurred.

COUNSEL:  And you don't know which one of them actually caused the blunt force trauma to the head that resulted in the death of Mason?

DR. ANZALONE:  That's correct.

\*    \*    \*    \*

COUNSEL:  Well, again, if you don't know when an injury was sustained but it wasn't enough to actually cause the death by falling off the stairs . . . could that have accelerated or aggravated –

DR. ANZALONE:  I don't know what you mean by 'accelerated' or 'aggravated.'

COUNSEL:  The trigger that actually causes death.

DR. ANZALONE:  No, I don't believe that you can sustain a fatal head injury consistent with subdural hematoma, with massive brain swelling, coupled with 9 scalp contusions, 11 on the torso, 2 on the penis from falling down a set of 4 stairs.  I do not believe that's possible.

\*    \*    \*    \*

During the State's re-direct examination of Dr. Randell Alexander, the following colloquy occurred.

THE STATE:  Doctor, [defense counsel] asked you if it was possible if there was a fall and it could have aggravated preexisting injuries; and I believe your answer was: 'Yeah, sure that was a possibility.' Explain your answer in relationship to his question and the facts of this case as you know them.

DR. ALEXANDER:  Well, I interpreted the question as just asking as a general question.  I mean, if you had a broken leg and you fell, you could make it worse.  You could

have a bruise on your body and fall down and get another bruise on your body.  As far as this particular set of circumstances, as far as this case is concerned, I don't think you can be in a position that a fall is going to cause this in the first place; and I don't think you can soften yourself up somehow and get yourself in such a preexisting shape that you can be in a position to get a fall.  I mean, if you're that badly brain damaged, you're not going to be standing up to take the fall in the first place, that that then aggravates what you have and tips you into lethal. So, I'd expect if somehow there's a second injury on top of a first and the first is so bad, you'd have all kinds of symptoms.  You'd have a whole different scenario.  And that's not what I've heard here.

\* \* \* \*

THE STATE:    And is it your opinion, based on everything you reviewed and your training and experience, that the severe head trauma incurred by this child, of course, resulted in his death, correct?

DR. ALEXANDER:    Yes.

THE STATE:    And based on the information that you've been provided, all the records, photographs, everything, is it your testimony that no way, no how did these injuries – were they incurred from falling off the bed or steps?

DR. ALEXANDER:    No, it's not possible.  You couldn't get all these injuries that way.

*Ex parte Jordan*, p. 256–269 (emphasis deleted; record citations omitted).

In rejecting petitioner's claim of ineffective assistance of trial counsel, the trial court made the following relevant findings:

5.   The Court is familiar with the performance of the applicant's trial counsel, Stephen Taylor, who has long practiced in the courts of Montgomery County and is qualified for appointment as trial counsel in criminal cases.

6.   Taylor submitted a credible affidavit in answer to the applicant's claims of deficient performance.

7.   Taylor conducted a thorough investigation into the facts of the case, and carefully selected a reasonable trial strategy to explain Mason's injuries. The applicant was not opposed to this strategy at the time of trial, and applicant's claim that counsel forced the trial strategy upon him [is] not credible.

*Id.*, p. 248. The Texas Court of Criminal Appeals relied on these findings in denying habeas relief. *Id.*, at cover.

To the extent petitioner relies on the affidavit of John Plunkett, M.D., for establishing the unreasonableness of trial counsel's strategy, his claim is without merit. As discussed above, Plunkett did not testify in his affidavit that Mason's fatal brain injuries were caused by his fall down the steps. Petitioner presents no probative summary judgment evidence establishing that Mason's fatal injuries were caused by falling down the steps. Consequently, he fails to demonstrate that trial counsel's trial strategy of blaming Mason's death on Katie Blake rather than the fall was an unreasonable trial strategy. Moreover, petitioner fails to show that, but for counsel's alleged deficiency, there is a reasonable probability that the result of the trial would have been different.

The state court denied relief on petitioner's claims for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or

involved an unreasonable application of *Strickland*, or was an unreasonable determination of the facts based on the evidence in the record. No basis for habeas relief is shown, and respondent is entitled to summary judgment on this issue.

C.   Misinformation as to fifteen-day notice

Petitioner complains that, as to the State's use of Dr. Alexander as a trial expert, trial counsel failed "to properly advise him concerning the requisite fifteen-day waiting period, which must be afforded the noticed party to prepare for trial in view of said notice." (Docket Entry No. 15, p. 33.) Specifically, petitioner alleges that trial counsel advised him to waive the 15-day notice requirement for the State's designation of expert witnesses, which left trial counsel unprepared for Dr. Alexander's trial testimony. Petitioner asserts that trial counsel did not meet Dr. Alexander until the day of trial.

In his affidavit submitted to the trial court on collateral review, trial counsel testified, in relevant part, as follows:

> Trial counsel was aware of the State's intent to use Dr. Randell Alexander as an expert witness prior to March 10, 2008, the date the State filed its discovery response, which was almost seven (7) weeks prior to trial. Trial counsel discussed Dr. Alexander and his proposed testimony with the Prosecutor prior to trial. Trial counsel discussed Dr. Alexander's anticipated testimony with Applicant regarding the 'window of opportunity' as to the time frame when Mason could have sustained his injuries, and Mason's ability to continue to walk or talk.

*Ex parte Jordan*, p. 259 (emphasis deleted).

In rejecting petitioner's claim on collateral review, the trial court made the following relevant findings:

5.     The Court is familiar with the performance of the applicant's trial counsel, Stephen Taylor, who has long practiced in the courts of Montgomery County and is qualified for appointment as trial counsel in criminal cases.

6.     Taylor submitted a credible affidavit in answer to the applicant's claims of deficient performance.

\* \* \* \*

8.     The State provided notice of its medical expert more than 45 days before trial, and the applicant was not asked to waive a continuance as a result of the State's designation of expert witnesses.  Applicant's allegation is not credible.

*Id.*, p. 248.  The trial court concluded that:

2.     The applicant has failed to prove by a preponderance of the evidence that he was denied his right to the effective assistance of counsel at trial or on appeal.

*Id.*, p. 249. The Texas Court of Criminal Appeals relied on these findings and the conclusion in denying habeas relief.  *Id.*, at cover.

Petitioner fails to rebut these factual findings with clear and convincing evidence and does not direct the Court to any written waiver in the record that he claims trial counsel forced him to sign. Further, that trial counsel did not actually *meet* the State's expert witness until the morning of trial does not negate trial counsel's review of, and familiarity with, the expert's written reports, medical records, and other documented evidence.  In short, petitioner presents no probative summary judgment evidence, and the record refutes his assertion, that the State did not notify trial counsel of its anticipated use of Dr. Alexander

until fifteen days before trial, and that trial counsel told petitioner to waive his right to a trial continuance.

Moreover, petitioner fails to establish actual prejudice, in that he fails to establish that, but for trial counsel's asserted deficient performance, there is a reasonable probability that the result of the trial would have been different. Petitioner's conclusory allegations are insufficient to raise a genuine issue of material fact precluding summary judgment. *See Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004) (holding that conclusory allegations are insufficient to create an issue of fact).

The state court denied relief on petitioner's claims for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of *Strickland*, or was an unreasonable determination of the facts based on the evidence in the record. No basis for habeas relief is shown, and respondent is entitled to summary judgment on this issue.

## V.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Persons convicted of a crime also are entitled to effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985). This Court reviews counsel's appellate performance under the *Strickland* standards. *See Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1998). Petitioner must allege and present facts showing that his appellate counsel's representation was deficient and that the deficient performance caused him prejudice. That is, petitioner must show that, but for appellate counsel's deficient performance, the outcome

27

of the appeal would have been different. *See Strickland*, 466 U.S. at 687–88, 692; *Jones v. Jones*, 163 F.3d 285, 300 (5th Cir. 1998).

Effective assistance of appellate counsel does not mean that counsel will raise every available nonfrivolous ground for appeal. *Evitts*, 469 U.S. at 394; *West*, 92 F.3d at 1396. Nor will counsel be deficient for failing to press a frivolous point. Rather, it means, as it does at trial, that counsel performs in a reasonably effective manner. *Evitts*, 469 U.S. at 394. A reasonable attorney has an obligation to research relevant facts and law and make informed decisions as to whether avenues will, or will not, prove fruitful. *Strickland*, 466 U.S. at 690–91.

In the instant case, petitioner complains that appellate counsel was ineffective in the following particulars.

A.      Failure to file motion for new trial

Petitioner complains that appellate counsel failed to file a motion for new trial challenging trial counsel's "failure to secure funds from the court to retain the services of a forensic pathologist." (Docket Entry No. 1, p. 9.)

In his affidavit submitted to the trial court on collateral review, appellate counsel testified, in relevant part, as follows:

> After receiving my appointment notice I had multiple conversations with Defendant's trial attorney, Stephen Taylor, regarding any issues he could see that required filing a motion for new trial. Mr. Taylor informed me that he was very satisfied with the trial court giving him all the lesser included offenses he asked for in the Jury Charge. He also indicated that he had advised [petitioner] to testify in the Guilt/Innocence phase of trial because [petitioner] gave two

different stories to the 911 dispatcher regarding what had happened to the three [sic] year old deceased child. The Defendant first stated to the dispatcher that he fell out of bed and then said he fell down the stairs outside on the porch. He told me that one issue the trial court may have erred on was allowing the maternal grandparents to testify regarding what kind of punishment the defendant should receive. I also met with Patty McGinnis lead counsel for the State of Texas regarding questions I had for the appeal and filing of a motion for new [t]rial. I concluded that [petitioner's] appellate issues did not require a motion for new trial being filed.

*Ex parte Jordan*, p. 206.

In rejecting petitioner's claim of ineffective assistance of appellate counsel, the trial court on collateral review made the following relevant findings:

11.   The Court is also familiar with the performance of the applicant's appellate counsel, Christopher Warren, who has long practiced in the courts of Montgomery County and is qualified for appointment as appellate counsel in criminal cases.

12.   Warren conducted a proper investigation before concluding that legitimate grounds for new trial did not exist.

13.   Warren conducted a thorough review of the appellate record, and his determination of issues to present on appeal was proper.

14.   Warren communicated effectively with the applicant through his family members during the direct appeal process.

15.   Warren's representation of the applicant was not deficient in any respect.

*Id.*, p. 248. The trial court made the following conclusion:

2.   The applicant has failed to prove by a preponderance of the evidence that he was denied his right to the effective assistance of counsel at trial or on appeal.

*Id.*, p. 249. The Texas Court of Criminal Appeals relied on these findings and the conclusion in denying habeas relief. *Id.*, at cover.

Petitioner does not brief this issue in his response to the motion for summary judgment, and he establishes neither deficient performance nor actual prejudice under *Strickland*. (Docket Entry No. 15, pp. 34–41.) Consequently, he fails to rebut the presumptions afforded the state court's determinations under the AEDPA standards of review, and fails to raise a genuine issue of material fact sufficient to preclude summary judgment.

The state court denied relief on petitioner's claims for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of *Strickland*, or was an unreasonable determination of the facts based on the evidence in the record. No basis for habeas relief is shown, and respondent is entitled to summary judgment on this issue.

B.   Failure to raise ineffective assistance of counsel

Petitioner argues that appellate counsel should have raised the Sixth Amendment claims for ineffective assistance of trial counsel asserted in this lawsuit.

In his affidavit submitted to the trial court on collateral review, appellate counsel testified, in relevant part, as follows:

> After reading the appellate record and clerk's record I felt that the 'four corners' of the records did not support ineffective assistance of counsel. An affidavit from trial counsel would help to understand what counsel's trial strategy was and a writ seemed the proper remedy. I explained this to

30

[petitioner] at the Goree Unit in Huntsville. [Petitioner] indicated that he was satisfied with my representation of him on appeal and inquired as to what my retainer would be to file a writ for ineffective assistance of counsel because defense counsel didn't use their own medical expert in his trial.

*Ex parte Jordan*, p. 206.

In rejecting petitioner's claim of ineffective assistance of appellate counsel, the trial court on collateral review made the following relevant findings:

11.  The Court is also familiar with the performance of the applicant's appellate counsel, Christopher Warren, who has long practiced in the courts of Montgomery County and is qualified for appointment as appellate counsel in criminal cases.

12.  Warren conducted a proper investigation before concluding that legitimate grounds for new trial did not exist.

13.  Warren conducted a thorough review of the appellate record, and his determination of issues to present on appeal was proper.

14.  Warren communicated effectively with the applicant through his family members during the direct appeal process.

15.  Warren's representation of the applicant was not deficient in any respect.

*Id.*, p. 248. The trial court made the following conclusion:

2.  The applicant has failed to prove by a preponderance of the evidence that he was denied his right to the effective assistance of counsel at trial or on appeal.

*Id.*, p. 249. The Texas Court of Criminal Appeals relied on these findings and the conclusion in denying habeas relief. *Id.*, at cover.

In Texas, claims for ineffective assistance of counsel are not commonly asserted on direct appeal. A reviewing court will rarely be in a position on direct appeal to evaluate fairly the merits of an ineffective assistance claim. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Thompson v. State*, 9 S.W.3d 808, 813–14 (Tex. Crim. App. 1999). "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740. To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* The trial record in the instant case is silent as to the reasons for those actions and decisions of trial counsel forming the basis of petitioner's complaints. Where there is no record on appeal relative to counsel's decisions, an allegation of ineffective assistance lies beyond effective appellate review, and the presumption that trial counsel acted reasonably will prevail on direct appeal. Consequently, petitioner here could not have succeeded on appeal as to any of his grounds of ineffective assistance of trial counsel, and appellate counsel was not ineffective in failing to raise these claims on appeal.

Regardless, this Court considered, and rejected, the merits of petitioner's claims of ineffective assistance of trial counsel. Petitioner has not shown a viable issue of ineffectiveness which appellate counsel failed to discover or raise on appeal, and he fails to establish that appellate counsel was deficient in his representation. Similarly, petitioner fails

to demonstrate a reasonable probability that a claim of ineffectiveness of trial counsel would have prevailed on appeal, and no prejudice is shown.

The state court denied relief on petitioner's claims for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of *Strickland*, or was an unreasonable determination of the facts based on the evidence in the record. No basis for habeas relief is shown, and respondent is entitled to summary judgment on this issue.

C.    Raising a frivolous issue on direct appeal

Appellate counsel unsuccessfully argued as the sole issue on appeal that the trial court erred during punishment in allowing Mason's grandparents to testify as to what would constitute appropriate punishment. Petitioner claims that appellate counsel was ineffective in raising this issue on appeal because the issue was frivolous.

In his affidavit submitted to the trial court on collateral review, appellate counsel testified, in relevant part, as follows:

> When I met with [petitioner] I explained that I could not find any issues in the guilt/innocence part of trial to argue on appeal. I explained to [him] that the 911 tape that was played for the jury had his voice describing to dispatch how the deceased child had fallen from his bed and injured himself, he then described to dispatch that the child had fallen down the front steps of the residence where they lived. Based on the inconsistencies in his description of how the child injured himself, I explained that our strongest argument was the issue of improper testimony from the deceased child's grandparents regarding what type of punishment he should receive. I did explain to [petitioner] that there was testimony from the state's medical expert on subdural hematomas that the minor child received and when they had occurred. [Petitioner's] trial attorney did not call an expert witness to rebut the state's expert on the length

33

of time the subdural hematomas had been present on the deceased child. I explained that he might check with his trial attorney on why there was not an expert called by the defense and that it may be an issue he could argue in a Writ of Habeas Corpus.

*Ex parte Jordan*, p. 207.

In rejecting petitioner's claim of ineffective assistance of appellate counsel, the trial court on collateral review made the following relevant findings:

11.   The Court is also familiar with the performance of the applicant's appellate counsel, Christopher Warren, who has long practiced in the courts of Montgomery County and is qualified for appointment as appellate counsel in criminal cases.

12.   Warren conducted a proper investigation before concluding that legitimate grounds for new trial did not exist.

13.   Warren conducted a thorough review of the appellate record, and his determination of issues to present on appeal was proper.

14.   Warren communicated effectively with the applicant through his family members during the direct appeal process.

15.   Warren's representation of the applicant was not deficient in any respect.

*Id.*, p. 248. The trial court made the following conclusion:

2.   The applicant has failed to prove by a preponderance of the evidence that he was denied his right to the effective assistance of counsel at trial or on appeal.

*Id.*, p. 249. The Texas Court of Criminal Appeals relied on these findings and the conclusion in denying habeas relief. *Id.*, at cover.

34

It is unclear whether petitioner's true complaint is that the issue raised on appeal was frivolous, or that counsel raised the unsuccessful issue in lieu of raising ineffective assistance of trial counsel. To the extent petitioner is limiting his complaint to counsel's raising the unsuccessful appellate issue, the trial court on collateral review found that appellate counsel's performance was not deficient. Petitioner does not rebut the presumed factual correctness of this finding with clear and convincing evidence, and fails to show that the legal determination of the *Strickland* claim was unreasonable. Moreover, petitioner fails to establish that, but for appellate counsel's challenge to the grandparents' testimony, there is a reasonable probability that petitioner would have prevailed on appeal.

Nor does petitioner identify an omitted appellate issue and show that, had appellate counsel raised the issue, he would have prevailed on appeal. To the extent petitioner complains that appellate counsel challenged the grandparents' testimony in lieu of raising claims for ineffective assistance of trial counsel, this Court has already determined that appellate counsel was not ineffective in not challenging trial counsel's performance. Petitioner fails to demonstrate either deficient performance or actual prejudice under *Strickland*.

The state court denied relief on petitioner's claims for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of *Strickland*, or was an unreasonable determination

of the facts based on the evidence in the record. No basis for habeas relief is shown, and respondent is entitled to summary judgment on this issue.

### D.   Failing to meet the requirements of *Anders v. California*

Petitioner additionally contends that appellate counsel failed to meet the minimum standards for constitutionally adequate appellate counsel set forth in *Anders v. California*, 386 U.S. 738 (1967), by failing to (1) notify him of his appointment on appeal; (2) consult with him; (3) respond to any of petitioner's letters; (4) meet the requirements of Texas Rules of Appellate Procedure 48.4 by sending petitioner a copy of the appellate court's opinion within five days of issuance; and (5) respond to post-conviction correspondence regarding petitioner's preparation of his state habeas application.

In his affidavit submitted to the trial court on collateral review, appellate counsel testified, in relevant part, as follows:

> Ms. Jennifer Jordan (Bradley Jordan's sister) called me shortly after I was appointed confirming that I was [petitioner's] appellate lawyer. She indicated that she was communicating on behalf of her brother in regards to my appointment status. I received a letter from [petitioner] asking to consult with him on issues for appeal. The correspondence coincided with many phone calls from [petitioner's] brother. I had several conversations with Mr. Todd Jordan (Bradley Jordan's [b]rother) over the time period that the appeal was pending and finalized on disposition. He communicated that he was meeting with his brother and was given questions to ask me regarding his case. I would give Mr. Todd Jordan as much phone time as was needed to answer the questions that were relayed back to [petitioner]. I did not receive any written requests from [petitioner] once dialogue began with his brother, Todd Jordan, during the pendency of the appeal. I explained to [petitioner's] brother in one of our conversations that the record is read thoroughly by the appellate attorney to find any issues and then it is examined to see if error has been preserved or needed to be preserved in order to argue that issue in Appellant's

36

brief. A subsequent conversations with Mr. Todd Jordan covered the issue I argued on appeal regarding improper witness testimony during punishment. Another conversation I recall with Mr. Todd Jordan was about the content of the 911 tape and [petitioner's] inconsistent story regarding the deceased child's head injuries. I am confident that I had a minimum of five conversations with Mr. Todd Jordan during the pendency of the appeal. I felt that I consulted with [petitioner] by communicating with his family members and that [petitioner's] intent was to communicate through them.

*Ex parte Jordan*, p. 207.

In rejecting petitioner's claim of ineffective assistance of appellate counsel, the trial court on collateral review made the following relevant findings:

11.   The Court is also familiar with the performance of the applicant's appellate counsel, Christopher Warren, who has long practiced in the courts of Montgomery County and is qualified for appointment as appellate counsel in criminal cases.

12.   Warren conducted a proper investigation before concluding that legitimate grounds for new trial did not exist.

13.   Warren conducted a thorough review of the appellate record, and his determination of issues to present on appeal was proper.

14.   Warren communicated effectively with the applicant through his family members during the direct appeal process.

15.   Warren's representation of the applicant was not deficient in any respect.

*Id.*, p. 248. The trial court made the following conclusion:

2.   The applicant has failed to prove by a preponderance of the evidence that he was denied his right to the effective assistance of counsel at trial or on appeal.

*Id.*, p. 249. The Texas Court of Criminal Appeals relied on these findings and the conclusion in denying habeas relief. *Id.*, at cover.

In *Anders*, the Supreme Court addressed the constitutional duties and responsibilities of appointed appellate counsel who has conscientiously determined that there is no merit to the indigent defendant's appeal. Appellate counsel in the instant case, however, filed a merits brief, and petitioner's reliance on *Anders* is misplaced. Rather, petitioner must proceed under the usual *Strickland* standards and show that appellate counsel's performance was deficient and that, but for such deficient performance, there is a reasonable probability that petitioner would have prevailed on appeal. Petitioner made no such showing on state collateral review, and he makes no such showing here.

The state court denied relief on petitioner's claims for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of *Strickland*, or was an unreasonable determination of the facts based on the evidence in the record. No basis for habeas relief is shown, and respondent is entitled to summary judgment on this issue.

## VI. CONCLUSION

Respondent's motion for summary judgment (Docket Entry No. 11) is **GRANTED**. The petition for a writ of habeas corpus is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**. A certificate of appealability is **DENIED**. Any and all pending motions are **DENIED** as moot.

The Clerk will provide copies of this order to the parties.

Signed at Houston, Texas, on this the _9th_ day of May, 2012.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

39